# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 18-1388V**
**Filed: August 31, 2026**

* * * * * * * * * * * * * * * * * * * * * * * * * *

EVELIN RIVERA CRUZ,

Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,

Respondent.

* * * * * * * * * * * * * * * * * * * * * * * * * *

*Shandra S. Kisailus*, Kisailus Law Firm LLC, Wilkes-Barre, PA, for Petitioner.
*Austin Joel Egan*, U.S. Department of Justice, Washington, DC, for Respondent.

**RULING ON ENTITLEMENT**[1]

**Shah**, Special Master:

On September 12, 2018, Evelin Rivera Cruz[2] ("Petitioner" or "Ms. Cruz") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa-10, *et seq*.[3] (the "Vaccine Act" or "Program"). ECF No. 1 ("Pet."). Petitioner alleges that she developed a Table injury, Guillain-Barré syndrome ("GBS"), as a result of an influenza ("flu") vaccination she received on September 16, 2015. *Id*. at 1.

---

[1] This Ruling will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means the Ruling will be available to anyone with access to the internet**. As provided in 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the Ruling's inclusion of certain kinds of confidential information. To do so, each party may, within 14 days, request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, this Ruling will be available to the public in its present form. *Id.*

[2] The petition was originally filed under the name "Evelin Lopes." Pet. at 1. Petitioner filed a motion to amend the caption on August 16, 2023, reflecting her divorce and change of legal name. ECF No. 70. That motion was granted the next day. ECF No. 73.

[3] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. For ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons discussed in this decision, I grant entitlement. The preponderant evidence established that Petitioner suffered the Table injury of GBS following flu vaccination, as alleged.

## I. PROCEDURAL BACKGROUND

Petitioner filed medical records with her petition and thereafter. Exs. 1-23. Respondent filed his Rule 4(c) Report on December 16, 2019, stating he did not believe this case was appropriate for compensation under the Vaccine Act. ECF No. 30 ("Resp't's Rep.") at 1.

Petitioner and Respondent then filed a series of expert reports. Petitioner filed one report from Petitioner's treating physician, Clifford Reed, M.D., and two reports from Norman Latov, M.D., Ph.D. Exs. 24, 25, 26. Respondent filed one report from Leo Wang, M.D., Ph.D. Ex. A.

Former Special Master Katherine E. Oler held an entitlement hearing on July 20, 2023. Minute Entry dated 7/20/2023. The parties filed post-hearing briefing after the entitlement hearing.

This case is ripe for adjudication.

## II. FACT EVIDENCE

### A. Medical Records[4]

#### 1. Pre-vaccination history

Prior to the vaccination, Ms. Cruz had a history of gastric bypass surgery, vitamin B12 ("B12") deficiency secondary to her gastric bypass, and degenerative joint disease in multiple joints, among other conditions. *See* Ex. 12 at 4. In May 2014, Petitioner fell at home and was admitted for a syncope workup. *Id.* at 8-9. She was ultimately diagnosed with a tibia and fibula nondisplaced fracture. *Id.* at 9.

In July 2014, Petitioner saw physiatrist Jun Yoo, M.D., for chronic low back pain that had recently worsened. Ex. 17 at 8. A lumbar spine MRI showed L4-L5 disc protrusion and a large annular tear. *Id.* She underwent an EMG, which revealed no "significant evidence of a lumbar or lumbosacral radiculopathy." *Id.* at 11.

On August 27, 2014, Petitioner saw her primary care physician ("PCP"), J. Marc Aynardi, M.D., reporting back and hip pain that rendered her unable to stand for more than 10-15 minutes. Ex. 12 at 8. Dr. Aynardi noted that she was on FMLA leave from work. *Id.* She exhibited reduced range of motion and tenderness of the right hip and lumbar back. *Id.* at 10. On September 18, 2014, she returned to Dr. Aynardi. Ex. 12 at 12. She was doing "dramatically better." *Id.* She had received two epidural blocks from pain management, along with a sacroiliac ("SI") joint

---

[4] Some of the filed medical records were not properly Bates stamped. For such exhibits, the citations in this Ruling reference the printed page numbers at the bottom of each page.

injection and a greater trochanter[5] injection on the right. *Id.* Dr. Aynardi approved her return to work. *Id.* at 13.

On February 24, 2015, Petitioner saw Dr. Aynardi to request a letter documenting her need for B12 oral therapy. Ex. 12 at 17. Dr. Aynardi instead advised that she needed injectable therapy to maintain adequate levels. *Id.* He provided a letter to that effect. *Id.* at 18.

2. Vaccination and post-vaccination history

Petitioner was 45 years old when she received the subject flu vaccination on September 16, 2015, at her workplace. Ex. 2 at 1. The next day, she saw PA Tuyet Parker at Dr. Aynardi's office, complaining of low back pain since "Monday" (September 14, 2015). Ex. 8 at 1. Her symptoms included muscle spasms, numbness, tingling, and pain. *Id.* She denied any injury. *Id.* On exam, she had decreased range of motion, tenderness, and spasms in the lumbar region. *Id.* at 1-2. PA Parker diagramed her symptoms, indicating they were in the lumbosacral region. *Id.* at 2. Her reflexes were normal. *Id.* The assessment was lumbar disc protrusion at L5-S1, bilateral low back pain, and sciatica. *Id.* at 2. She was prescribed a Medrol DosePak and a muscle relaxant. *Id.*

On September 21, 2015, Petitioner underwent a lumbar spine MRI that revealed "mild degenerative changes" since the July 2014 MRI. Ex. 4 at 7. At that visit, her weight was recorded while she was standing. *Id.* at 8.

On September 28, 2015, Petitioner saw her pain management specialist. Ex. 21 at 2. She reported that she was in "stable health" until two weeks earlier, when "she developed sudden onset pain in the lower back. Pain radiated into her posterolateral thighs, legs and into the feet and big toes of each foot." *Id.* She complained of numbness and tingling in the lower extremities and weakness of the left leg. *Id.* She experienced bladder and bowel incontinence "that started two weeks ago." *Id.* She was advised to go to the ER for further care. *Id.* at 3.

Petitioner presented to the Reading Hospital ER the same day for back pain and urinary incontinence. Ex. 4 at 30. She reported that approximately two weeks earlier, she was trying to get out of a car and felt a "pop." *Id.* at 37. The next day, she felt "heaviness," and when she went to work, she could not walk or stand up from a sitting position. *Id.* About two to three days later, she developed incontinence. *Id.* At the time of triage, she could minimally lift her right leg but could not lift her left leg. *Id.* She was admitted. *Id.* at 36.

Also on September 28, 2015, Petitioner was seen by neurosurgeon Herman Lawson, M.D., and PA Weeda Nejrabi. Ex. 4 at 175, 182. She stated that over the past three days, she had experienced generalized weakness in all extremities, rendering her unable to hold a cup of coffee or walk around the house. *Id.* at 176. On exam, she had weakness in her bilateral upper extremities and in her knees, ankles, and toes. *Id.* at 181. She had normal reflexes. *Id.*

---

[5] Greater trochanter or trochanter major: a broad, rounded process, flattened medially, at the upper end of the lateral surface of the femur, to which several muscles are attached. *Trochanter major*, DORLAND'S MEDICAL DICTIONARY ONLINE ("DORLAND'S"), https://www.dorlandsonline.com/dorland/definition?id=115126 (last accessed on August 24, 2026).

The same day, a cervical spine MRI, with and without contrast, showed the following: "Suggestion of increased signal within central aspect of the cord at C5-C7, concerning for demyelinating plaque, difficult to definitively characterize due to motion." Ex. 4 at 49. A thoracic MRI was normal, and a lumbar MRI did not show any compressive lesion that explained the symptoms. *Id.* at 49-51.

Also on September 28, 2015, Petitioner was seen by hospitalist Craig Derr, M.D. Ex. 4 at 183. At that time, she reported having increased difficulty walking after her September 21, 2015 MRI, when she felt something give in her back. *Id.* She described numbness in the fourth and fifth digits of both hands, as well as weakness in the left hand. *Id.* She needed assistance to walk around the house. *Id.* at 183-84. On exam, she had 2+ reflexes throughout her body and 3/5 strength in both legs. *Id.* at 188. Dr. Derr suspected a possible demyelinating disease. *Id.* at 184. He noted that Petitioner had a history of B12 deficiency and planned to check her level. *Id.* On September 29, 2015, her B12 level was recorded as high at 1,249.[6] *Id.* at 332.

During an infectious disease consultation on September 29, 2015, Petitioner reported she developed severe weakness at work on September 14, 2015, took the following day off work, and returned to work on September 16, 2015. Ex. 4 at 152.

On September 29, 2015, Petitioner was seen by neurologist Lyzette Velazquez, M.D. Ex. 4 at 166. Petitioner reported the onset of slow, progressive weakness over the previous two weeks. *Id.* She had received the flu vaccine on September 16. *Id.* She "got sick with flu like symptoms and developed weakness of the legs with unsteady gait, difficulty standing from a sitting position and recent onset of her hand weakness with difficulty doing her [c]rochet or holding a cup of coffee." *Id.* She denied any history of febrile or gastrointestinal illness. *Id.* "This past Sunday [September 27]" she felt a pop in her back as she was walking to her house. *Id.* Dr. Velazquez commented:

> [45-year-old] woman presenting with subacute weakness of the lower limbs with involvement of the upper limbs of 7-10 days duration. The only event during that period is flu vaccination. The neurological examination is significant for bilateral weakness of all 4 extremities, diffuse [areflexia] and peripheral sensory deficit to be symmetrical. She is most likely suffering from Guillain Barre syndrome, [rule out] viral vs. [i]mmunological.

*Id.* at 174.

A lumbar puncture was performed the same day. Ex. 4 at 47. The cerebrospinal fluid ("CSF") protein level was high at 50,[7] with 1-2 white blood cells. *Id.* at 72, 331. Petitioner was started on plasmapheresis therapy. *See id.* at 40.

---

[6] Vitamin B12 reference range: 179-891 pg/mL. Ex. 4 at 332.

[7] CSF Protein reference range: 15-45 mg/dL. Ex. 4 at 331.

On September 30, 2015, Dr. Velazquez noted that Petitioner's CSF protein level of 50 was "not too high but I am suspecting a subacute process." Ex. 4 at 139. At that time, Petitioner had 4/5 strength proximally and distally in her right leg, but her left leg had only 2/5 strength proximally and distally. *Id.* at 139-40.

On October 2, 2015, Petitioner was seen by Dr. Velazquez. Ex. 4 at 98. She had received three plasmapheresis treatments. *Id.* At that time, she had 5/5 strength of the upper extremities and her right leg. *Id.* Her left leg strength was 2/5. *Id.* She had absent pinprick and light touch sensation over the left leg. *Id.* Her left leg reflexes were absent, but she had normal Achilles and patellar reflexes on the right. *Id.* The diagnosis was "[a]cute inflammatory neuropathy or GBS." *Id.* at 99. Dr. Velazquez commented that "the left monoplegia [was] unusual in GBS and need[ed] further evaluation." *Id.* She stated: "It is unclear her left monoplegia etiology, will continue watching her and see her clinical progression." *Id.*

In an exam by nephrology that same day, Petitioner reported her right leg strength was slightly improved, but she still had "significant [neurological symptoms] including extreme weakness of the [left lower extremity], cold sensation and pins/needles on left." Ex. 4 at 101.

On October 5, 2015, Petitioner saw Dr. Yoo for electrodiagnostic testing. Ex. 4 at 52. The NCS showed "delayed latency in bilateral ulnar and median nerves and no response in bilateral sural and right peroneal nerve." *Id.* at 55. Dr. Yoo concluded the findings were compatible with GBS, with demyelination in all extremities that was more severe in the lower extremities and most severe in the left lower extremity. *Id.* at 56. He did not detect any "abnormal spontaneous activities suggesting axonal damage." *Id.*

Petitioner improved with plasmapheresis, with her main continued deficit being left leg weakness, which also was gradually improving. Ex. 4 at 40. She was discharged to a rehabilitation facility on October 6, 2015. *Id.* Her discharge diagnosis was "weakness of both lower extremities." *Id.* at 39. She was discharged from the rehabilitation facility on October 20, 2015. *Id.* at 628-29.

On November 20, 2015, Petitioner presented to orthopedist Jeffrey Gehret, D.O., regarding her low back pain, neck pain, and radiating lower extremity pain and weakness. Ex. 18 at 3-4. She reported that she had a long history of low back pain and radiating lower extremity pain, predominantly on the right side. *Id.* After her September 2015 flu vaccination, she developed diffuse pain and weakness in her extremities. *Id.* She was wearing an orthotic on her left foot due to a foot drop. *Id.* Dr. Gehret assessed chronic inflammatory demyelinating polyneuropathy ("CIDP"), though the basis for this diagnosis was unstated. *Id.*

On December 3, 2015, Petitioner went to Dr. Aynardi, complaining of new-onset headaches and paresthesias on the side of her face. Ex. 8 at 8. On December 8, 2015, Petitioner had a psychosocial evaluation by psychologist Anthony Tzoumas, Ph.D. Ex. 6 at 1. She reported anxiety, depression, and insomnia due to her GBS. *Id.* She explained that she developed excruciating pain, along with progressive numbness and weakness, one day after her flu vaccination. *Id.* Dr. Tzoumas assessed adjustment disorder with mixed anxiety and depressed mood. *Id.* at 4.

On December 22, 2015, Petitioner saw neurologist Clifford Reed, M.D. Ex. 5 at 30. She reported that one day after her flu vaccination, "she developed severe low back pain[.]" *Id.* She then experienced rapidly emerging GBS symptoms, including weakness and a feeling like "ants crawling" on her legs. *Id.* She also reported that one year earlier, after a previous flu vaccination, she experienced diffuse weakness in all of her limbs that persisted for a year. *Id.* On exam, she had decreased sensation, strength, and reflexes and an impaired gait. *Id.* at 30-31. Dr. Reed diagnosed "low-grade" GBS for one year after a flu vaccination, leading to more severe GBS "after the current flu shot." *Id.* at 31.

On January 5, 2016, Petitioner saw Dr. Yoo for a repeat EMG/NCS. Ex. 17 at 1207. The sensory nerve conduction study showed "mildly prolonged peak latency in bilateral sural nerves, but normal findings in bilateral upper extremities." *Id.* at 1210. Dr. Yoo's impression was that the EMG "showed significant interval improvement of AIDP compared to EMG/NCS of 10/5/15." *Id.* On exam, Petitioner exhibited poor effort with her left lower leg, making it difficult to assess her strength. *Id.* Her strength had improved in the right leg and in the proximal left leg. *Id.*

From February 19-March 1, 2016, Petitioner was hospitalized for treatment of severe major depressive disorder. Ex. 7 at 1-2. On March 9, 2016, she saw ophthalmologist Katherine Hu, M.D., for blurry vision, light sensitivity, tearing, and pain. Ex. 14 at 29-31. Dr. Hu noted that Petitioner was very depressed and that there might be a functional component to her symptoms. *Id.* at 31. She diagnosed ptosis of both eyelids, noting the possibility that it was related to her GBS. *Id.*

On April 7, 2016, Petitioner saw Dr. Reed. Ex. 14 at 28. He commented that Petitioner's September 28, 2015 MRI of the cervical spine "was read as possible [multiple sclerosis ("MS")] lesion but I had the neuroradiologist look at it and he and I both think this might be artifact." *Id.* He did not believe Petitioner had MS and considered her ongoing symptoms to be consistent with GBS. *Id.* He planned to do a repeat cervical spine MRI. *Id.*

A repeat cervical spine MRI was completed on April 17, 2016, revealing "a relatively well-defined band of increased signal within the posterior half of the cord between approximately C3-C4 and C5-C6." Ex. 14 at 10. The image quality was somewhat degraded by motion, but "the signal pattern [was] very similar to the prior study but [was] currently more clearly defined and slightly smaller." *Id.*

On April 29, 2016, Petitioner saw Dr. Yoo for another EMG/NCS, which was normal. Ex. 17 at 1262-63. Petitioner demonstrated minimal active movement of her left ankle dorsiflexor and plantaflexor, with 5-/5 strength in all other areas. *Id.*

On May 31, 2016, Petitioner saw Leon Venier, M.D., in Dr. Reed's office for a repeat EMG. Ex. 14 at 18. The EMG showed a diffuse decrease in recruitment in all extremities, but the NCS was normal, with no evidence of a root lesion, plexopathy, peripheral neuropathy, or myopathy. *Id.* at 22. Dr. Venier felt the study did not show decreased conduction velocities, as would be typical in GBS. *Id.* He attributed her unusual GBS presentation to the fact that she received early intervention. *Id.*

Dr. Reed saw Petitioner on June 22, 2016. Ex. 5 at 63. He noted that her electrodiagnostic studies had shown improvement, consistent with her GBS diagnosis. *Id.* In light of the ptosis of her eyelids, he ordered a myasthenia gravis panel, which was negative. Ex. 14 at 1-4.

On September 6, 2016, Petitioner had an independent medical examination for worker's compensation purposes. Ex. 14 at 13. Neurologist Donald McCarren, D.O., did not believe Petitioner had flu vaccine-caused GBS. *Id.* at 16. He was instead suspicious she had MS, due to her family history. *Id.* He noted that Petitioner did not put forth a full effort during the examination. *Id.* at 17. Also, her reported symptoms "were present well before her vaccination." *Id.* at 16.

Dr. Reed provided a letter in response to Dr. McCarren's opinion on September 26, 2016. Ex. 5 at 73. He commented that MS was his subspecialty, and he did not believe Petitioner had MS, as her CSF had no oligoclonal banding, only a slightly elevated protein level, and a normal IgG synthesis rate. *Id.* Her imaging was not consistent with MS, and his review of Petitioner's cervical spine MRIs with neuroradiology indicated the imaging abnormalities were artifacts, not pathological. *Id.* He did not have a better explanation for Petitioner's ongoing symptoms aside from GBS. *Id.* at 73-74.

On November 6, 2016, Dr. Aynardi wrote a letter to Petitioner's counsel stating that Petitioner had GBS "most likely" caused by her flu vaccine. Ex. 9 at 1-2.

On November 28, 2016, Petitioner saw Dr. Reed, reporting only minimal improvement of her walking over the previous two months. Ex. 5 at 75. Dr. Reed's impression was "status post GBS with residual and very minimally and slowly improving abnormal neurological signs and symptoms." *Id.*

Petitioner presented to the ER on December 19, 2016, complaining of weakness, heavy eyelids, fatigue, numbness of the feet and hands, dry mouth, and a feeling like ants were crawling on her legs. Ex. 20 at 13. A CT scan and MRI of the brain were normal. *Id.* at 2-3. She was discharged. *Id.* at 23.

On December 23, 2016, Petitioner saw Dr. Reed, complaining of trouble swallowing liquids and solids, progressive ptosis over the course of the day, dry mouth, and a feeling of ants crawling on her. Ex. 5 at 76. She exhibited decreased strength on exam, but Dr. Reed questioned her effort. *Id.* She had normal reflexes. *Id.* Dr. Reed commented that she had a "new constellation of symptoms that require ruling out myasthenia gravis," which was a separate condition from her GBS. *Id.* He also suspected restless leg syndrome. *Id.* A repeat myasthenia gravis panel was negative. Ex. 14 at 4-8.

Nearly two years later, on October 26, 2018, Petitioner returned to Dr. Reed with the same complaint of a sensation of ants crawling on her legs. Ex. 23 at 7. Dr. Reed suspected possible new-onset restless leg syndrome, along with chronic GBS impairment. *Id.* at 9. Petitioner's ferritin level was low, so Dr. Reed prescribed ferritin sulfate supplementation, along with magnesium and probiotics. *Id.*

On January 28 and April 3, 2019, Petitioner saw Dr. Reed for the same restless leg symptoms. Ex. 23 at 10, 12-13. Dr. Reed directed her to continue taking the prescribed supplements.

On October 4, 2019, Petitioner complained to Dr. Reed of continued restless leg symptoms, which had not improved, along with weakness in all extremities, with the greatest weakness in her right leg. Ex. 23 at 16-17.

**B. Petitioner's Affidavit and Hearing Testimony**

In her affidavit, executed June 22, 2023, Petitioner stated she had a pre-vaccination history of back pain, which was controlled with medications. Ex. 29 ("Cruz Aff.") at 1; Tr. at 7-9. The pain was localized to her back. Tr. at 7. She also had a history of B12 deficiency that was secondary to her 2003 gastric bypass surgery. Cruz Aff. at 1. She had used B12 injections for years and her levels were routinely monitored. *Id.* The B12 deficiency did not impede her work or daily activities, and she could not recall a time when her levels were low enough to concern her physicians. *Id.*

On September 14, 2015, Petitioner experienced a popping sensation in her back. Tr. at 13. That pop was similar to the pop a knee makes when one stands up. *Id.* It occurred while she was walking. *Id.* The back pain was nothing new but required her to leave work early the next day so she could get some rest and not aggravate it. *Id.* at 14-15. She scheduled an appointment with her PCP for September 17, 2015, but returned to work on September 16, where she received a flu vaccine. *Id.* at 15-16. Although she was still experiencing back pain on September 16, 2015, she was able to drive to work and work the entire day, with no weakness in her hands, arms, or legs. *Id.* at 16. She did not go to work on September 17. *Id.* at 18.

On Monday, September 21, 2015, Petitioner had an MRI. Tr. at 18. Her only ongoing symptom at that time was lingering back pain. *Id.* She was able to walk and to climb onto the exam table. *Id.* at 19. About two days later (September 23), she began experiencing weakness and numbness in her legs. *Id.* She called her PCP and was advised to see her pain management physician.[8] *Id.* at 19-20. She was unable to get an appointment with pain management before her already-scheduled September 28 appointment. *Id.* at 20. Over that weekend, she began feeling numbness and tingling in her legs and arms. *Id.*

Petitioner's affidavit stated that about a week and a half after her flu vaccination (about September 26), she began experiencing pain and numbness that began at her feet and travelled up to her waist and hands, and her legs became weak. Cruz Aff. at 1-2. She said she initially believed that her symptoms were related to her prior back pain, but she had never experienced numbness and weakness in her legs and arms. *Id.* at 3-4. She had difficulty explaining her new symptoms to her treating physicians in comparison to her former back pain. *Id.* at 2.

---

[8] The medical records do not appear to have any documentation of this call.

Petitioner's pain continued to get worse, eventually leading to an inability to walk or do anything on her own. Cruz Aff. at 2. She was bedridden for four days and even went a day without eating, because she was home alone and had no assistance. *Id.* On or about September 26, 2015, she lost bladder and bowel function. *Id.* At a pain management appointment two days later, she was unable to climb onto the examination table, and she was told to go to the ER. *Id*. at 3.

At the hearing, Petitioner testified she began experiencing numbness and weakness on or about September 24, 2015. Tr. at 19. She had a pain management appointment scheduled for September 28 but attempted to schedule something sooner due to the growing weakness in her legs. *Id.* at 19-20. There were no appointments available. *Id.* at 20. Over the weekend, she lost bowel and bladder function; her son had to carry her to the bathroom because she could not walk. *Id.* at 21. When her son went to work, she was confined to her bed and could not eat or drink; she had an accident in bed. *Id.*

Petitioner's friend had to help her walk to attend her pain management appointment on September 28, 2015. Tr. at 22. Her doctor told her to go to the ER. *Id.* at 23. A neurosurgeon, Dr. Velazquez, saw her in the ER and ordered further MRIs. *Id.* at 25. She underwent five plasmapheresis treatments, which improved her strength and reduced the numbness in her legs. *Id.* at 27-28.

After completing plasmapheresis treatment, Petitioner began physical and occupational therapy. Tr. at 28. She regained some ability to walk but was unable to drive for two-and-a-half years. *Id.* at. 32. She suffered depression, panic attacks, and anxiety because she could not leave her home. *Id.* About five months after the vaccination, she was admitted to an inpatient psychiatric hospital for suicidal ideations. *Id.* at 33.

On cross examination, Petitioner stated that she fell in May 2014 when she fainted getting out of the shower. Tr. at 42-43. Her doctors believed the episode was caused by low blood pressure, but it was not investigated further. *Id.* at 43.

## III. <u>EXPERT EVIDENCE</u>

### A. Expert Reports

#### 1. <u>Petitioner's Expert: Clifford Reed, M.D.</u>

Dr. Reed, Petitioner's treating neurologist, submitted one expert report. Ex. 24 ("Reed Rep."). He did not provide a CV but stated that he had specialized in MS for more than 40 years. *Id.* at 2.

Dr. Reed stated that one day after her flu vaccination, Petitioner developed unusually severe low back pain and a feeling like ants were crawling from her toes to her knees. Reed Rep. at 1. She was diagnosed with "post flu vaccine [GBS]." *Id.* When Dr. Reed examined her after her hospitalization, she had trace ankle reflexes, +1 reflexes in her remaining limbs, diminished pin prick sensation from the left toes to the upper leg, decreased pin prick sensation in the ulnar

distribution of both hands, and absent vibration in the toes. *Id.* She also had decreased strength in all extremities. *Id.*

Dr. Reed did not believe Petitioner had MS. Reed Rep. at 1. Her brain MRI on September 28, 2015, did not reveal any signs of MS. *Id.* Also, she did not have oligoclonal bands. *Id.* The abnormalities seen on the April 17, 2016 cervical spine MRI were likely artifacts, not true lesions. *Id.* at 2. The assessment of Dr. McCarren, the worker's compensation physician, who diagnosed MS, was not credible. *Id.*

Dr. Reed "could find no reasonable alternative diagnosis on this patient other than post flu shot GBS." Reed Rep. at 1.

2. Petitioner's Expert: Norman Latov, M.D., Ph.D.

Dr. Latov filed two reports in this case. Ex. 25 ("First Latov Rep."); Ex. 26 ("Second Latov Rep."). Dr. Latov earned his M.D. and his Ph.D. in pathology from the University of Pennsylvania. Ex. 28 ("Latov CV") at 1. He completed his residency in neurology and a fellowship in immunology at Columbia Presbyterian Medical Center. *Id.* at 2. He is board certified in neurology and is a professor of neurology at Weill Cornell Medical College. *Id.* at 1-2. Much of his practice is devoted to "the evaluation, diagnosis and treatment of patients with autoimmune neurological diseases[,] including [GBS] and other autoimmune neuropathies." First Latov Rep. at 1.

Dr. Latov is on the editorial board of the Journal of Clinical Neurology and has published more than 160 peer-reviewed papers. Latov CV at 3-15. Until 2012, he directed a neuroimmunology lab that researched the mechanism of autoimmune peripheral neuropathies. First Latov Rep. at 1. His lab is credited with the discovery of anti-MAG and GM1 ganglioside antibodies, which are used to treat patients with suspected autoimmune neuropathies. *Id.*

Dr. Latov opined that GBS was the correct diagnosis for Petitioner. First Latov Rep. at 2. Her electrodiagnostic testing in the hospital was consistent with GBS. *Id*. at 1. Additionally, repeat electrodiagnostic studies showed significant improvement, also consistent with GBS, "rather than another or pre-existing neuropathy[.]" *Id.*

Dr. Latov opined that the subject "flu vaccination caused or contributed to the development of GBS." First Latov Rep. at 2. He cited the *Schonberger* study, which showed an increase in GBS in adults receiving the 1976-1977 swine influenza vaccine compared to an unvaccinated population, with onset occurring as soon as one day after vaccination. *Id.* (citing Schonberger, L.B. et al., *Guillain-Barré syndrome following vaccination in the National Influenza Immunization Program, United States*, 1976-1977. 110(2) AM J EPIDEMIOL, pp.105-123 (1979) (Ex. 27, Tab AA) ("*Schonberger*")). Dr. Latov argued this might occur via bystander activation of autoreactive T cells or molecular mimicry. *Id.*; *see* Pacheco, Y. et al., *Bystander activation and autoimmunity.* 103 J AUTOIMMUN, 102301 (2019) (Ex. 27, Tab X) ("*Pacheco*"); Segal, Y. & Shoenfeld, Y. *Vaccine-induced autoimmunity: the role of molecular mimicry and immune crossreaction*. 15(6) CELL MOL IMMUNOL. 586-594 (2018) (Ex. 27, Tab BB) ("*Segal*").

Dr. Latov further argued that even if Petitioner's GBS started before the flu vaccination, "it is likely that the vaccine further aggravated or exacerbated the GBS." First Latov Rep. at 2. He cited *Farez*, in which seven MS patients who received the yellow fever vaccine had an increased relapse rate. *Id.* (citing Farez, M.F. & Correale, J., *Yellow fever vaccination and increased relapse rate in travelers with multiple sclerosis*. 68 ARCH NEURAL pp. 1267-1271 (2011) (Ex. 27, Tab J) ("*Farez*")). *Toplak* was a study of juvenile idiopathic arthritis and flu vaccine with similar results. *Id.* (citing Toplak, N. et al., *Safety and efficacy of influenza vaccination in a prospective longitudinal study of 31 children with juvenile idiopathic arthritis.* 30 CLIN EXP RHEUMATOL pp. 436-444 (2012) (Ex. 27, Tab GG) ("*Toplak*")). *De Simone* reported a case in which pemphigus was exacerbated on two occasions shortly after flu vaccinations. *Id.* (citing De Simone, C. et al., *Exacerbation of pemphigus after influenza vaccination.* 33 CLIN EXP DERMATOL pp. 718-720 (2008) (Ex. 27, Tab G) ("*DeSimone*")). Lastly, *Pollard & Selby* reported a case in which a patient had three episodes of acute/chronic inflammatory demyelinating polyneuropathy, "each of which followed tetanus toxoid immunization." *Id.* (citing Pollard, J.D. & Selby, G., *Relapsing neuropathy due to tetanus toxoid. Report of a case.* 37(1-2) J NEURAL SCI pp. 113-125. (1978) (Ex. 27, Tab Y) ("*Pollard & Selby*")).

Dr. Latov proposed that "[v]accination induces the release of cytokines, that in addition to stimulating immune cells, increase the permeability of the blood nerve barrier, allowing ingress of T-cells and antibodies that can result in more severe nerve damage." First Latov Rep. at 2. Several studies documented an increase of pro-inflammatory cytokines with various vaccines, including flu; thus, the flu vaccination "could result in rapid exacerbation of [Petitioner's] GBS." *Id.* (citing Mohanty, S. et al., *Prolonged Proinflammatory Cytokine Production in Monocytes Modulated by Interleukin 10 After Influenza Vaccination in Older Adults*. 211 J INFECT DIS. pp. 1174-1184 (2014) (Ex. 27, Tab V) ("*Mohanty*"); O'Gorman, W.E. et al., *The Split Virus Influenza Vaccine rapidly activates immune cells through Fcγ receptors.* 32(45) VACCINE, pp. 5989-5997 (2014) (Ex. 27, Tab W) ("*O'Gorman*"); Talaat, R. et al., *Rapid changes in serum cytokines and chemokines in response to inactivated influenza vaccination*. 12(2) INFLUENZA OTHER RESPIR VIRUSES pp. 202-210 (2018) (Ex. 27, Tab EE) ("*Talaat*"); Herin, D.M. et al., *Comparison of adaptive and innate immune responses induced by licensed vaccines for human papillomavirus.* 10(12) HUM. VACCINE IMMUNOTHER. pp. 3446-3454 (2014) (Ex. 27, Tab P) ("*Herrin*"); Simon, W.L. et al., *Cytokine production associated with smallpox vaccine responses*. 6(10) LMMUNOTHERAPY pp. 1097-1112 (2014) (Ex. 27, Tab CC) ("*Simon*"); Christian L.M. et al., *Serum proinflammatory cytokine responses to influenza virus vaccine among women during pregnancy versus nonpregnancy*. 70(1) AM J REPROD LMMUNOL. pp. 45-53 (2013) (Ex. 27, Tab E) ("*Christian*"); de Vries H.E. et al., *The influence of cytokines on the integrity of the blood-brain barrier in vitro.* 64(1) J NEUROIMMUNOL pp. 37-43 (1996) (Ex. 27, Tab H) ("*de Vries*"); Tsao, N. et al., *Tumour necrosis factor-alpha causes an increase in blood-brain barrier permeability during sepsis*. 50(9) J MED MICROBIAL pp. 812-821 (2001) (Ex. 27, Tab HH) ("*Tsao*"); Wong, D. et al., *Cytokines, nitric oxide, and cGMP modulate the permeability of an in vitro model of the human blood-brain barrier.* 190 EXP NEUROL pp. 446-455 (2004) (Ex. 27, Tab JJ) ("*Wong*")).

3. <u>Respondent's Expert: Leo Wang, M.D., Ph.D.</u>

Dr. Wang submitted one expert report in this case. Ex. A ("Wang Rep."). He earned his M.D. and Ph.D. in cellular neurobiology from the Washington University School of Medicine in

St. Louis. Ex. B ("Wang CV") at 1l; Wang Rep. at 1. He completed a neurology residency and neuromuscular fellowship at the University of Washington. Wang Rep. at 1. He is an associate professor of neurology at the University of Washington School of Medicine and an attending physician at Seattle Children's Hospital. Wang CV at 1. He is board certified in neurology, neuromuscular medicine, and electrodiagnostic medicine. *Id.* He conducts research on muscular dystrophy and has published about 33 peer-reviewed papers and six book chapters on neuromuscular diseases. *Id.* at 2-8.

Dr. Wang noted that Petitioner had a history of chronic low back pain, L4-5 disc herniation, gastric bypass surgery, and B12 deficiency, which at times required treatment with intramuscular injections. Wang Rep. at 1. In May 2014, she fell in the shower, suffering a tibial plateau fracture and a flareup of her lumbar disc symptoms. *Id.* She developed generalized body pain and back pain. *Id.* She received a flu vaccination on September 24, 2014, about one year before the subject flu vaccination. *Id.* at 2. Her PCP, Dr. Aynardi, believed she developed a "minor version of GBS" caused by the 2014 flu vaccine, but her fall and pre-existing lumbar disease complicated that question. *Id.*

Two days before the subject flu vaccination, on September 14, 2015, Petitioner was walking on uneven terrain and felt a pop in her back. Wang Rep. at 2. According to ER records from September 28, 2015, "[a]fter that time, she had bilateral lower extremity numbness and sensation of weakness[.]" *Id.* Dr. Wang felt this report was consistent with several other medical records documenting heaviness, weakness, and inability to walk in the days before the vaccination. *Id.* These reports suggested Petitioner's symptoms predated her September 16, 2015 vaccination. *Id.*

Petitioner woke up the day after the vaccination with worsened back pain. Wang Rep. at 2. She had a lumbar spine MRI on September 21, 2015, which showed degenerative changes. *Id.* After that test, she developed worsening bilateral lower extremity numbness and weakness and bladder and bowel incontinence. *Id.* At the hospital, her MRIs were unremarkable except for a cervical spine MRI showing increased signal within the central aspect of the cord at C5-C7. *Id.* Her CSF showed slightly increased protein. *Id.* at 3. The glucose level and white blood cell count were normal. *Id.* The consulting neurologist in the hospital, Dr. Velazquez, found absent reflexes on September 29, 2015, which, combined with the clinical history, led her to diagnose GBS. *Id.* However, two other physicians, including one neurologist, found Petitioner had normal reflexes. *Id.*

Petitioner's course after her hospitalization was marked by physical and mental disability. Wang Rep. at 3. She had another cervical spine MRI on April 17, 2016, which showed increased signal in the posterior half of the cord between C3-C4 and C5-C6. *Id.* Her worker's compensation examination showed abnormalities consistent with cognitive impairment, but those findings were questionable because of poor effort by Petitioner. *Id.* at 4. The exam also showed signs of symptom magnification. *Id.*

Dr. Wang opined that Petitioner did not, more likely than not, suffer from GBS caused by the subject flu vaccination. Wang Rep. at 4. She had neurological symptoms that predated the vaccination; these were reported on several occasions close in time to the events in question. *Id.*

Also, her symptoms and test results were not consistent with a GBS diagnosis. *Id.* She had predominantly left-sided weakness, which is unusual in GBS. *Id.* She had inconsistent reflex exams, with some physicians finding normal reflexes. *Id.* Her lab results were nonspecific and did not necessarily point to GBS, as Dr. Reed acknowledged. *Id.* Her EMG/NCS showed "absence of the sural sensory nerve. This is atypical for [GBS]." *Id.* at 5.

Dr. Wang felt the more appropriate diagnosis for Petitioner was B12 deficiency, most likely caused by her gastric bypass procedure. Wang Rep. at 5. Her levels were frequently low-normal and were "really sensitive." *Id.* Moreover, about 30% of patients with symptoms of B12 deficiency have normal B12 levels. *Id.* (citing Briani, C. et al., *Cobalamin deficiency: Clinical picture and radiological findings*. 5 NUTRIENTS pp. 4521-4539 (2013) (Ex. A, Tab 3) ("*Briani*"); Means, R.T., Fairfield K.M., *Clinical manifestations and diagnosis of vitamin B12 and folate deficiency.* UPTODATE.COM accessed 9/2/2021. (Ex. A, Tab 4) ("*Means & Fairfield*")). Symptoms of B12 deficiency may include peripheral neuropathy, with axonal degeneration with or without demyelination, consistent with Petitioner's case. *Id.*

According to Dr. Wang, "the most significant evidence that [Petitioner] has B12 deficiency is the MRI abnormality on the cervical spine MRI." Wang Rep. at 6. This finding was seen on two scans. *Id.* Dr. Wang disagreed with Dr. Reed that this was an artifact, noting that Dr. Reed might have an "anchor bias" from his perspective as an MS subspecialist. *Id.* In his view, the description of the MRI images was "consistent with subacute combined degeneration of the cord, which is caused by vitamin B12 deficiency." *Id.* In B12 deficiency there is most commonly "symmetric bilateral high signal within the dorsal columns." *Id.* (citing Sharma, R. and Gaillard F., *Subacute combined degeneration of the cord.* RADIOPAEDIA.ORG accessed 9/2/2021 (Ex. A, Tab 6) ("*Sharma*")). This appearance has been described as an inverted "V" sign. *Id.* (citing *Sharma*); *see also* Sen, A. and Chandrasekhar, K., *Spinal MR imaging in Vitamin B12 deficiency: Case series; differential diagnosis of symmetrical posterior spinal cord lesions.* 16 ANN INDIAN ACAD NEUROL. pp. 255–258 (2013) (Ex. A, Tab 7) ("*Sen*").

Dr. Wang concluded:

> Vitamin B12 deficiency is a disorder that mimics Guillain-Barré Syndrome and it is easy to see how that could not be prioritized, especially in the setting of low-normal vitamin B12 levels. However, because of 1) the history of prior vitamin B12 deficiency requiring intramuscular supplementation, 2) the exam findings of asymmetry and possible preserved reflexes, 3) unimpressive cerebrospinal fluid profile, 4) the nonspecific nerve conduction study findings that are consistent with vitamin B12 deficiency, and 5) and the cervical MRI changes (not seen in Guillain-Barré Syndrome), her diagnosis is unlikely Guillain-Barré Syndrome.

Wang Rep. at 6. Moreover, even if Petitioner had GBS, the timing of her symptoms predated the subject vaccination, ruling out vaccine causation. *Id.*

4. Dr. Latov: Second Expert Report

Dr. Latov disagreed with Dr. Wang's alternative diagnosis of B12 deficiency-caused neuropathy. Second Latov Rep. at 1. He noted that GBS can present with asymmetric weakness. *Id.* Moreover, despite Petitioner's asymmetric presentation, the electrodiagnostic testing showed neuropathy in all of her extremities, not just the left leg. *Id.* Furthermore, CSF protein levels can be normal in the early phase of GBS, "and the elevation can be variable." *Id.* Deep tendon reflexes are also not always absent in GBS, especially early in the disease. *Id.*

Dr. Latov noted that Dr. Wang believed the absence of sural sparing in Petitioner's nerve conduction studies likely ruled out GBS. Second Latov Rep. at 1. However, the *Derksen* paper noted that "only 35% of their patient[s] with GBS had sural sparing"; these patients had similar GBS presentations as those without sural sparing. *Id.* (citing Derksen, A. et al., *Sural sparing pattern discriminates Guillain-Barré syndrome from its mimics.* 50 MUSCLE AND NERVE pp. 780-784 (2014) (Ex. 27, Tab I) ("*Derksen*"). Also, other features of Petitioner's electrodiagnostic testing were characteristic of GBS and not B12 deficiency. *Id.* (citing Fine, E. et al., *The neurophysiological profile of vitamin B12 deficiency*. 13(2) MUSCLE NERVE pp. 158-164 (1990) (Ex. 27, Tab K) ("*Fine*"); Puri, V. et al., *Vitamin B12 deficiency: a clinical and electrophysiological profile*. 45(5) ELECTRAMYAGR CLIN NEUROPHYSIAF pp. 273-284 (2005) (Ex. 27, Tab Z) ("*Puri*")).

Dr. Latov opined that Petitioner's B12 levels were not low but instead were low-normal or normal. Second Latov Rep. at 1. Petitioner would have needed to have a significantly low B12 level "for a prolonged time" to develop neuropathy. *Id.* She was not exposed to nitrous oxide, which can deplete B12. *Id.* "Even if one believes that neurological deficits can occur with normal B12 levels, it would be a stretch to argue that this would be more likely than not." *Id.*

Similarly, Dr. Latov disputed the opinion that Petitioner's MRIs were diagnostic of B12 deficiency. Second Latov Rep. at 1. He pointed out that the abnormalities described could have inflammatory, metabolic, infectious, toxic, hereditary, or nutritional causes. *Id.* (citing Garg, R. et al., *Approach to a case of myeloneuropathy.* 19(2) ANN INDIAN ACOD NEURAL pp. 183-187 (2016) (Ex. 27, Tab M) ("*Garg*")). Also, GBS has been associated with development of transverse myelitis, "with inflammatory changes occurring in both the nerves and spinal cord, following infection, surgery or vaccination." *Id.* (citing numerous papers).

Lastly, Dr. Latov disagreed with Dr. Wang's opinion that Petitioner's neurological symptoms began before her vaccination. Second Latov Rep. at 2. Petitioner had a history of lower back pain, which explained her pre-vaccination symptoms. *Id.* The symptoms characteristic of GBS, such as weakness, numbness, and incontinence, began after her September 16, 2015 flu vaccination. *Id.* Low back pain is common and not a typical symptom of neuropathy. *Id.* And, even if Petitioner's GBS symptoms began before her vaccination, the vaccine "would have aggravated or contributed to the development of the neuropathy[.]" *Id.*

### B. Expert Testimony

1. Dr. Latov's Testimony

Dr. Latov was recognized as an expert in neurology. Tr. at 56. He noted that Petitioner had a pre-vaccination history of back pain with a sciatic component. *Id.* at 57-58. Her pre-vaccination symptoms were not consistent with either a B12 deficiency neuropathy or GBS. *Id.* at 58-59; 62.

Petitioner's first post-vaccination medical appointment was on September 17, 2015, when she complained of muscle spasms, numbness, tingling, and pain that started after a "pop incident" in her back on September 14, 2015. Tr. at 62. Her neurological exam was normal. *Id.* These symptoms, in Dr. Latov's opinion, were not specific to GBS, and there was "no indication of any generalized neuropathy" at that time. *Id.* at 62-63.

On September 28, 2015, Petitioner reported one week of urinary and bowel incontinence, along with bilateral extremity weakness and numbness that began on September 23, 2015. Tr. at 65-66. Dr. Latov believed these symptoms were distinct from her prior back issues. *Id.* at 66. Petitioner's physical examination that day was consistent with a spinal cord issue, but not the type associated with a B12 deficiency. *Id.* at 68. She had normal sensory function, which would not be typical in B12 deficiency. *Id.* Additionally, a B12 deficiency would first present with dorsal sensory degeneration and then motor issues. *Id.* GBS, by contrast, would present with ascending weakness in the legs in about half of the cases; the other half could involve the arms, have more sensory symptoms, or be multifocal. *Id.* at 69. Petitioner's presentation was more compatible with "typical" GBS. *Id.* Her CSF protein level was also consistent with GBS. *Id.* at 77-78.

Dr. Latov pointed out that one of Petitioner's treating neurologists found absent deep tendon reflexes. Tr. at 75. There could be multiple explanations for why Petitioner had reflexes during one exam and no reflexes during another. *Id.* Notably, with a B12 deficiency, one would expect increased rather than decreased reflexes. *Id.* at 99.

Dr. Latov commented on a medical record that noted Petitioner had "left monoplegia." Tr. at 79. He believed that since both of Petitioner's legs were initially weak, later monoplegia would indicate asymmetric recovery or a changing presentation as the disease evolved. *Id.* at 79-80. This did not rule out GBS. *Id.* at 81.

Dr. Latov pointed out that GBS is "self-limiting," in that symptoms progress for weeks and then start improving. Tr. at 81-82. This was consistent with Petitioner's course, which improved with plasmapheresis. *Id.* at 82. By contrast, one would not expect plasmapheresis to improve B12-associated neuropathy, because that treatment would deplete B12, which would worsen the deficiency. *Id.* at 82-83. Moreover, there were several factors in Petitioner's case that were inconsistent with a B12 deficiency. Petitioner's B12 levels were normal at the time of her hospital admission. *Id*. at 90. The progression of B12 deficiency neuropathy is slower than Petitioner's course. *Id.* at 102. Bowel and bladder dysfunction, as Petitioner experienced, are more consistent with GBS than B12 neuropathy. *Id.*

Petitioner's electrodiagnostic testing and imaging were consistent with GBS. Tr. at 88. The EMG/NCS study showed demyelination of the myelin sheath and asymmetric nerve involvement. *Id.* The sural nerves were affected as well, which is not unusual. *Id.* at 89. Her repeat EMG/NCS showed improvement, which was compatible with GBS. *Id.* at 91. Her cervical spine MRI did not show the characteristic inverted "V"-shaped signal or posterior cord involvement, as would be expected in B12 deficiency neuropathy. *Id.* at 72, 104.

Regarding causation, Dr. Latov cited the "1977 swine flu study" as evidence that the flu vaccine can cause GBS. Tr. at 105. With respect to onset, different physicians could have different interpretations, but Dr. Latov placed the onset of Petitioner's GBS between September 26 and 28, 2015. *Id*. at 70. He explained that her weakness, the most reliable signifier of GBS, began during that time. *Id.* at 85.

On cross examination, Dr. Latov clarified that weakness is a consistent element of GBS, whereas pain, numbness, and tingling are more variable and nonspecific. Tr. at 108. He acknowledged that Petitioner's B12 levels in the hospital were elevated because she had been given B12 supplementation. *Id.* at 110. He cited *Schoenfeld* to opine that the onset of GBS can be as soon as one day after vaccination, with a peak in symptoms three to four weeks later. *Id.* at 111.

2. <u>Dr. Wang's Testimony</u>

Dr. Wang was recognized as an expert in neurology. Tr. at 115. He interpreted the medical records to indicate that Petitioner experienced a pop in her back on September 14, 2015, and began having numbness and weakness in the days thereafter, before the September 16, 2015 flu vaccination. *Id*. at 116-22.

Dr. Wang explained that he did not agree with a diagnosis of GBS for four reasons: (1) Petitioner's presentation was asymmetric in presentation and upon exam; (2) Petitioner had reflexes; (3) her CSF had nonspecific findings; and (4) the EMG/NCS was not consistent with GBS. Tr. at 123. Based on Petitioner's presentation and her testing and imaging results, Dr. Wang opined that the correct diagnosis was a B12 deficiency causing an acute neuropathy. *Id.* at 124-26.

Regarding Petitioner's EMG/NCS studies, Dr. Wang pointed out that the lack of response from the sural nerves and right peroneal nerve indicated an axonal neuropathy and suggested GBS was not the correct diagnosis. Tr. at 124-25. The sural nerve is located on the outside of the ankle and is one of the most distal sensory nerves studied in electrodiagnostic testing. *Id.* at 125. It is usually spared from damage in GBS. *Id.* Axonal neuropathy was also suggested by the finding of decreased amplitude and distal stimulation of the bilateral median nerves. *Id.* at 145-46.

Dr. Wang noted that patients who have undergone gastric bypass need to carefully monitor their B12 levels to ensure they're "consistently high"; levels can drop quickly, leading to neurological symptoms. Tr. at 136. Petitioner had to take supplemental B12 to keep her levels stable after her gastric bypass procedure. *Id.* at 131. She took an oral supplement, but her levels still dropped, requiring her to switch to an injectable formulation that was better absorbed. *Id*. at

127-28. The level taken in the hospital in September 2015 was not a particularly useful marker, as Petitioner had just received a B12 injection. *Id.* at 129. Her level again dropped to a suboptimal number by November 24, 2015. *Id.* at 130. Dr. Wang also pointed out that patients can have normal B12 levels and still have symptoms of a B12 deficiency. *Id.* at 131. In his practice, he would do further testing to confirm the deficiency in a patient with a normal B12 level, but that was not done in Petitioner's case. *Id.* at 131-32.

Petitioner's April 17, 2016 cervical spine MRI showed a relatively well-defined band of increased signal in the posterior half of the cord between approximately C3-C4 and C5-C6. Tr. at 134. Although the image was somewhat affected by motion, the signal pattern was interpreted as "very similar to the prior study [from September 28, 2015], but is currently more clearly defined and slightly smaller." *Id.* Dr. Wang did not believe the abnormality was an artifact, because that would have produced a different image. *Id.* Instead, he interpreted the MRIs as consistent with "classic" B12 deficiency neuropathy. *Id.* at 134-35.

Dr. Wang testified that the literature reports neuropathy due to B12 deficiency can have an acute onset, even where the neuropathy is not immediately triggered by nitrous oxide. Tr. at 135-36.

On cross, Dr. Wang acknowledged that back pain could signify either GBS or B12 deficiency neuropathy, but such pain was not diagnostic of either disease. Tr. at 142. He also acknowledged that the EMG/NCS found no evidence of "abnormal spontaneous activities suggesting axonal damage." *Id.* at 148. He explained that this could mean the axonal damage was "developing." *Id.* Further, the lack of sural sparing did not necessarily rule out GBS. *Id.* at 157.

Commenting on Petitioner's mental health problems following her hospitalization, Dr. Wang pointed out that B12 deficiency can lead to cognitive changes. Tr. at 151. He acknowledged that her MRI report did not specifically reference a classic inverted "V" sign, but it did say the posterior half of the cord was affected, consistent with B12 deficiency neuropathy. *Id.* at 155-56.

Dr. Wang clarified that both GBS and B12 deficiency neuropathy can present with areflexia. Tr. at 170. Also, a minority of GBS patients can have an asymmetric presentation. *Id.* However, the fact that Petitioner's case had multiple atypical features pulled against a GBS diagnosis. *Id.* at 169.

In response to questions from the special master, Dr. Wang explained that plasmapheresis treatment would not likely improve B12 deficiency symptoms. Tr. at 174. However, Petitioner was given a B12 supplement around the same time plasmapheresis was started, which "could have helped." *Id.* Dr. Wang disagreed that the fact that Petitioner developed motor weakness pulled against a B12 deficiency neuropathy. *Id.* at 175. In his experience, B12 deficiency "can cause motor problems." *Id.* at 175-76.

## IV. <u>APPLICABLE LAW</u>

### A. Petitioner's Burden in Vaccine Program Cases

Under the Vaccine Act, a petitioner may prevail in one of two ways. First, she may show that she suffered a Table injury within the time provided in the Table. § 11(c)(1)(C)(i). "In such a case, causation is presumed." *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006); *see* § 13(a)(1)(B). Second, where the alleged injury is not listed in the Table, she may demonstrate that she suffered an "off-Table" injury that was caused-in-fact by the vaccination. § 11(c)(1)(C)(ii). To establish a Table claim, a petitioner must make a factual showing sufficient to meet the relevant requirements for the alleged injury, as set forth in the Table's Qualifications and Aids to Interpretation ("QAIs"). § 14(b); 42 C.F.R. § 100.3(c) ("The following qualifications and aids to interpretation shall apply to, define and describe the scope of, and be read in conjunction with [the list of vaccine-injury combinations].")

Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. § 13(a)(1). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before she may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010); *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). A petitioner may not receive a Vaccine Program award based solely on her assertions; rather, the petition must be supported by either medical records or the opinion of a competent physician. § 13(a)(1).

**B. Law Governing Analysis of Fact Evidence**

The process for making factual determinations in Vaccine Program cases begins with analyzing the medical records, which are required to be filed with the petition. §11(c)(2). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." §13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F. 3d 415, 417 (Fed. Cir. 1993) (it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given later, provided that such determination is based on a rational analysis).

Medical records created contemporaneously with the events they describe are generally trustworthy, because they "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions," where "accuracy has an extra premium." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1382 (Fed. Cir. 2021) (quoting *Cucuras*, 993 F.2d at 1528). Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *See generally Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475 at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony, especially where such testimony conflicts with the record evidence. *Cucuras*,

993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, there are situations in which compelling oral testimony could be more persuasive than written medical records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); *Lowrie*, 2005 WL 6117475, at *19 ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent.") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, the special master should assess each witness's credibility when determining the weight their testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *LaLonde v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In deciding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony, a rational analysis must be explicated. *Burns*, 3 F.3d at 417.

### C. Analysis of Expert Testimony

Establishing a sound and reliable medical theory connecting the vaccine to the injury often requires a petitioner to present expert testimony in support of his or her claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594-96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999)). "The *Daubert* factors for analyzing the reliability of testimony are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community." *Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592-95).

The *Daubert* factors play a slightly different role in Vaccine Program cases than they do in other federal judicial proceedings. Those factors are employed by judges to exclude evidence that is unreliable and potentially confusing to a jury. In Vaccine Program cases, these factors are

generally used to assess the reliability and weight of scientific evidence. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66-67 (2010) ("[U]niquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted[.]"). The flexible use of the *Daubert* factors to evaluate persuasiveness and reliability of expert testimony has routinely been upheld. *See, e.g.*, *Snyder*, 88 Fed. Cl. at 743.

Respondent frequently offers one or more experts of his own to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). Nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion/ proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). A "special master is entitled to require some indicia of reliability to support the assertion of the expert witness." *Moberly*, 592 F.3d at 1324. Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis special masters must employ in Vaccine Program cases. *Id.* at 1325-26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("[T]his court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

### D. Consideration of Medical Literature

Finally, although this decision discusses some but not all the medical literature in detail, I have reviewed and considered all the medical records and literature submitted in this matter. *See Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though [s]he does not explicitly reference such evidence in h[er] decision."); *Simanski v. Sec'y of Health & Hum. Servs.*, 115 Fed. Cl. 407, 436 (2014) ("[A] Special Master is 'not required to discuss every piece of evidence or testimony in her decision.'") (citation omitted), *aff'd*, 601 F. App'x 982 (Fed. Cir. 2015).

## V. <u>ANALYSIS</u>

Petitioner advances two theories of recovery. First, she alleges she has suffered the Table injury of GBS following flu vaccination. *See* Pet.'s Post-Hrg. Br. at 1-2. Alternatively, she argues she has proven GBS caused-in-fact by her flu vaccination, meeting the *Althen* prongs of causation. *Id.* at 19. As discussed below, I conclude that Petitioner has preponderantly proven the elements of the Table claim of GBS following flu vaccination. Accordingly, she is entitled to compensation.

### A. Table Requirements

The Vaccine Injury Table includes the injury of GBS following flu vaccination, so long as

the onset of GBS occurs from 3-42 days after vaccination. 42 C.F.R. § 100.3(a)(XIV)(D). The relevant QAIs for GBS require the following to be demonstrated:

> (A) Bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs;
> (B) A monophasic illness pattern;
> (C) An interval between onset and nadir of weakness between 12 hours and 28 days;
> (D) Subsequent clinical plateau (the clinical plateau leads to either stabilization at the nadir of symptoms, or subsequent improvement without significant relapse; however, death may occur without a clinical plateau); and,
> (E) The absence of an identified more likely alternative diagnosis.

*Id.* § 100.3(c)(15)(ii).

**B. Petitioner's Condition Satisfied The Table Requirements For GBS Following Flu Vaccination.**

1. <u>Bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs</u>

Petitioner exhibited bilateral 3/5 strength in her legs at the time of her pain management visit on September 28, 2015. Ex. 21 at 2. These findings were replicated during examinations at the time of her admission to the hospital, including by neurosurgeon Dr. Lawson and hospitalist Dr. Derr, both of whom assessed bilateral weakness. Ex. 4 at 181, 188. By the time she was initially seen by neurologist Dr. Velazquez on September 29, 2015, she was observed to have weakness in all four extremities. *Id.* at 174.

As Dr. Wang pointed out and as Dr. Velazquez noted, Petitioner had some asymmetry in her weakness, in that her left leg remained weaker than her right. Wang Rep. at 4; Ex. 4 at 99. The *Sheikh* paper stated that marked, persistent asymmetry of weakness might cast doubt on a GBS diagnosis, whereas symmetrical weakness is supportive of the diagnosis. *Sheikh* at 1185 (Table 3-1). But Dr. Latov persuasively explained that Petitioner's initial presentation involved weakness in both legs; her monoplegia developed somewhat later. Tr. at 79-81. This would indicate she had an asymmetric recovery or a changing presentation as the disease evolved and would not rule out GBS. *Id.* Furthermore, Dr. Wang agreed that "in a minority of GBS cases, there is [a] nonclassical, asymmetrical presentation[.]" *Id.* at 170.

Petitioner was also assessed with areflexia in her weak limbs, though her reflex exams were inconsistent. One day after her admission, her initial examination by neurologist Dr. Velazquez found diffuse areflexia, along with weakness in all extremities. Ex. 4 at 174. She was also assessed with diminished reflexes when Dr. Reed saw her in December 2015. Ex. 5 at 30-31.

Overall, the evidence preponderates in favor of finding that Petitioner meets the first QAI.

2. Monophasic illness pattern

Petitioner's course appears to have been monophasic, and neither expert contended it was not. She developed weakness in all four limbs, was hospitalized and treated with plasmapheresis, underwent inpatient rehabilitation, and stabilized with improving strength. Her electrodiagnostic testing, which was initially abnormal and consistent with GBS, showed improvement by April 2016. Ex. 19 at 1262-63. Although Petitioner continued to manifest weakness in her left leg, she did not complain of another bout of worsening weakness. Dr. Reed ruled out chronic inflammatory demyelinating polyneuropathy. Ex. 5 at 63.

3. Interval between onset and nadir of weakness between 12 hours and 28 days

As discussed in more detail below, the onset of Petitioner's GBS was, more likely than not, after her September 21, 2015 MRI and before her hospitalization on September 28, 2015. At the time of her presentation to the ER on September 28, she could barely lift her right leg and could not move her left leg. Ex. 4 at 36. On September 29, Dr. Velazquez assessed weakness in all four extremities, along with diffuse areflexia. *Id.* at 174. After plasmapheresis treatment, her condition improved. *Id.* at 39. By October 1, 2015, Petitioner had normal strength in her upper extremities but still had slight weakness in her right leg and could not move her left leg at all. *Id.* at 117. By October 2, she had regained normal strength in all extremities except her left leg. *Id.* at 98. Overall, the records show the nadir of symptoms was within the onset-to-nadir range set forth in the QAIs.

4. Subsequent clinical plateau

Similarly, the evidence demonstrated that Petitioner's condition plateaued after her nadir of weakness. She made slow progress in the hospital and in rehabilitation. At the time of her discharge from rehabilitation on October 20, 2015, she was walking with a rolling walker and wearing a foot brace on her left side. Ex. 4 at 628-29. When she first saw Dr. Reed on December 22, 2015, she was walking with an assistive device and reported that her lower extremity weakness had slightly improved over the previous two weeks. Ex. 5 at 30. On June 23, 2016, Dr. Reed found she had improved reflexes compared to earlier exams. *Id.* at 63. He assessed "[s]lowly improving post flu vaccination AIDP[.]" *Id.*

5. Absence of a more likely identified alternative diagnosis

The parties disputed whether an alternative diagnosis better explained Petitioner's symptoms. Dr. Wang opined that Petitioner more likely suffered from an acute neuropathy caused by B12 deficiency than GBS. For several reasons, Dr. Wang's opinion was not persuasive.

First, Dr. Wang's opinion relied heavily on Petitioner's cervical spine MRIs, which were taken on September 28, 2015,[9] and April 7, 2016. Wang Rep. at 6. He argued that an

[9] Dr. Wang's report stated the first cervical spine MRI was taken October 6, 2015, but the medical records indicated the test was done September 28, 2015. Ex. 4 at 49. Dr. Wang provided the correct date during his testimony. Tr. at 132-33.

"abnormality" was seen on both of those occasions, described as "a well-defined band of increased signal within the posterior half of the cord between approximately C3-C4 and C5-C6." Id. The shape and placement of this abnormality was, in his view, consistent with subacute combined degeneration of the cord, which is caused by B12 deficiency. Id. (citing *Sharma*).

The physicians who interpreted the MRI images saw different things. Both MRIs were degraded by motion. The first MRI found abnormal signal in the central aspect of the spinal cord at C5-C7, while the second MRI found an abnormality in the posterior aspect of the cord between C3-C4 and C5-C6. *Compare* Ex. 4 at 49 (September 28, 2015 MRI finding a "[s]uggestion of increased signal within central aspect of the cord at C5-C7, concerning for demyelinating plaque, difficult to definitively characterize due to motion") *with* Ex. 14 at 10 (April 7, 2016 MRI finding "a relatively well-defined band of increased signal within the posterior half of the cord between approximately C3-C4 and C5-C6"). Despite the differences in the location of the observed signal in the two MRIs, the radiologist interpreting the second MRI, Jennifer Jung, M.D., concluded this abnormality was "very similar" to that seen in the first MRI. Ex. 14 at 10. On the other hand, Dr. Reed documented that he reviewed the images with two different radiologists, each of whom opined that the abnormalities observed in the MRIs were artifactual, not real. Ex. 5 at 73 (noting that the radiologists he consulted believed "the abnormalities mentioned on both cervical MRIs are artifactual and have to do with alignment of the spinal cord vertically along with alignment of the MRI and can cause linear signals that do not represent any pathological process.").

Dr. Wang argued the abnormal signal was real, because an artifactual finding would not appear "very similar" in two different images. Tr. at 134. But it appears from the record that Dr. Wang did not review the MRI images themselves; he only reviewed the interpretive reports.[10] This limits the reliability of his interpretation of the findings. On this record, the MRI findings are equivocal at best. Notably, no physician who read the actual images suspected a lesion caused by B12 deficiency.

Second, Dr. Wang opined that Petitioner's serum B12 level was "sensitive" and tended to stay in a suboptimal range for gastric bypass patients. Wang Rep. at 5. He correctly pointed out that serum B12 levels are often normal in deficient patients, warranting additional testing of serum metabolite concentrations to more precisely detect a potential deficiency. *Id.*; *see Saperstein* at 1296 ("Some evidence suggests that commonly used assays of serum [B12] are not sufficiently sensitive to be the ideal method of diagnosing [B12] deficiency."). The record showed that while Petitioner carried a diagnosis of B12 deficiency, she consistently received B12 supplementation, and her serum levels in 2014-2015 were not ever recorded as below normal. *See generally* Ex. 12. Perhaps further testing of her B12 metabolite concentrations would have produced useful diagnostic information, but this was not done. Tr. at 131-32. As a result, there is no laboratory evidence that Petitioner was, in fact, B12 deficient during the relevant period.

Third, Dr. Latov persuasively pointed out that the plasmapheresis treatment Petitioner received would not likely have improved her condition if she had a B12 deficiency-caused neuropathy. Tr. at 83. To the contrary, plasmapheresis would have depleted her B12 and caused her to become more deficient. *Id.* Dr. Wang did not dispute this but countered that the B12 supplementation Petitioner received in the hospital still could have helped her recover. *Id.* at 174.

[10] The MRI images were not filed into the record in this case.

Fourth, none of Petitioner's treating physicians seriously considered B12 deficiency neuropathy as a diagnosis. Notably, hospitalist Dr. Derr did mention her history of B12 deficiency and had her serum level checked while she was in the hospital. Ex. 4 at 184. Her level was 1,249, which was supranormal, likely because she had received a dose of supplemental B12 in the hospital. *Id.* at 332; Tr. at 174. B12 deficiency neuropathy was not mentioned in the differential diagnosis. Instead, Petitioner's treating physicians, including her neurologists, consistently diagnosed GBS, despite the unusual aspects of her case.

Fifth, the fact that Petitioner did not have "sural sparing" on electrodiagnostic testing did not rule out GBS, as Dr. Wang agreed. Tr. at 157. Although sural sparing is diagnostic of GBS, the lack thereof does not exclude GBS. *See Derksen* at 780; Second Latov Rep. at 1. Petitioner's electrodiagnostic testing was repeatedly read as consistent with GBS. Ex. 4 at 55-56; Ex. 17 at 1210, 1262-63; Ex. 14 at 22.

Sixth, the literature did not suggest B12 deficiency neuropathy was a likely diagnosis for Petitioner, though that condition shares some overlapping symptoms with GBS. The *Briani* paper stated: "Vitamin B12 deficiency may manifest with neurological features or megaloblastic anemia. Signs of dorsal column involvement (loss of position and vibration sense and ataxia), lateral column involvement (spasticity, hyperreflexia and positive Babinski sign) and spinothalamic tracts involvement (sensory level) should be looked for." *Briani* at 256. These signs do not match Petitioner's case. In *Saperstein*, the authors studied 27 patients with sensory or sensorimotor polyneuropathies who tested positive for B12 deficiency. *Saperstein* at 1296. NCS testing of B12 deficient patients was often normal or showed axonal damage, and those patients were more likely to experience sudden onset of neuropathy in the hands. *Id.* at 1296, 1298. Again, this did not fit with Petitioner's clinical course or testing as it was interpreted by her physicians.

Accordingly, I conclude Petitioner preponderantly satisfied the QAIs for GBS under the Table.

6. <u>Onset from three to 42 days after vaccination</u>

The contemporaneous medical records revealed inconsistencies in the histories given by Petitioner to different providers, clouding the issue of onset. Nonetheless, I conclude the overall record preponderantly placed the onset of GBS between September 21 and September 28, 2015, within the 3-42-day range set forth in the Table.

Petitioner had a history of chronic low back pain that had been exacerbated the previous year when she fell in the shower. Ex. 12 at 8. The evidence indicated that on or about September 14, 2015, she felt a "pop" sensation in her lower back while she was walking outside.[11] She stayed

---

[11] The records were inconsistent on where Petitioner was walking when she felt this "pop." One record said it occurred while she was getting out of her car; another said she was walking on "uneven terrain"; and a third said she was walking to her house. Ex. 4 at 35, 37, 166. The common thread among these accounts is that Petitioner was walking outside when the pop occurred. She testified that the pop occurred on September 14, 2015. Tr. at 13.

home from work the next day but returned to work on September 16, at which time she received the subject flu vaccination. At the September 17, 2015 visit with her PCP, Petitioner reported having pain, spasms, numbness, and tingling. Ex. 8 at 1. The September 17 record, including the diagram created by the provider, documented that her symptoms at that time were confined to the lumbosacral area and did not extend to her limbs. *Id.* at 1-2.

On September 21, 2015, Petitioner had a lumbar MRI. Ex. 4 at 7. She testified that she was able to walk into the office and independently climb onto the exam table for the test. Tr. at 19. The MRI record did not contradict her testimony or otherwise indicate that Petitioner was experiencing limb weakness at that time; to the contrary, it showed Petitioner was able to stand on a scale to be weighed that day. *Id.* at 8. By the time Petitioner saw her pain management physician on September 28, 2015, however, she was complaining of numbness and tingling of the lower extremities and weakness of the left leg, along with bladder and bowel incontinence. Ex. 21 at 2. When she was seen in the ER later that day, she could only minimally lift her right leg and could not lift her left leg at all. Ex. 4 at 37.

As noted, Petitioner made varying reports to her physicians regarding when she developed symptoms, including weakness. At times, she reported developing weakness as soon as September 14 or 15, 2015. *See*, *e.g.,* Ex. 4 at 142 (on September 29, 2015, reporting to neurology that she had been "developing weakness since about the 14th or l5th of the month," which worsened after the flu vaccination a day or two later); *id.* at 152 (on September 29, 2015, reporting to infectious disease that she developed severe weakness at work on September 14 and had to be picked up); *id.* at 37 (on September 28, 2015, reporting to the ER that she felt "heaviness" one day after the "pop" incident). At other times, she said her weakness began later, including as late as a few days before her hospitalization. *See, e.g.,* Ex. 4 at 175-76 (on September 28, 2015, reporting to neurosurgery that over the past three days she experienced generalized weakness in all extremities); *id.* at 31 (reporting to ER on September 28 that she had noticed weakness in her lower extremities "over the last few days").[12] Given the variances in Petitioner's reported chronology, the September 21, 2015 MRI record and the September 28, 2015 examinations in the hospital provide more objective anchor points for determining when her weakness began. Because she was able to independently attend, stand to have her weight measured, and complete the MRI on September 21, 2015, she likely did not have significant weakness at that time. But by September 28, 2015, both of her legs were found to be very weak. Accordingly, the record shows the onset of weakness was between September 21 and 28, 2015.

Dr. Latov opined that Petitioner's "weakness and numbness in the legs and the incontinence[] clearly began following the 9/16/15 vaccination[.]" Second Latov Rep. at 2. He placed the onset of GBS between September 26 and September 28. Tr. at 70. Dr. Wang disagreed, arguing that Petitioner's GBS began with the "pop" incident in her lower back on September 14. Tr. at 116-22. He acknowledged that back pain is nonspecific, however, and that Petitioner had a

[12] Petitioner's story at the hospital also varied as to when the "pop" incident in her lower back and incontinence occurred. *See, e.g.,* Ex. 4 at 183 (on September 28, 2015, reporting that she felt something give in her back after the September 21 MRI); *id.* at 166 (on September 29, 2015, reporting to neurology that she felt a pop in her back on September 24); *id.* at 37 (on September 28, 2015, reporting to the ER that she developed incontinence on September 16 or 17); Ex. 21 at 2 (on September 28, reporting to pain management that she developed incontinence two weeks earlier).

history of such pain. *Id.* at 142-43. As Dr. Latov explained, limb weakness and incontinence are clearer indicators of GBS. Tr. at 85. I am persuaded by this reasoning, particularly given Petitioner's pre-vaccination history of chronic low back pain.

Thus, I conclude that the onset of Petitioner's GBS was within the 3-42-day range set forth in the Table.

## VI. CONCLUSION

Upon careful evaluation of all the evidence submitted in this matter, including the medical records, the testimony, the experts' opinions, and the medical literature, I conclude that Petitioner has shown by preponderant evidence that she is entitled to compensation under the Vaccine Act. **Her petition is therefore GRANTED.** An order regarding damages will issue shortly.

**IT IS SO ORDERED.**

**s/ Jennifer A. Shah**
Jennifer A. Shah
Special Master